IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


DEBRA D. BAKER,

        Plaintiff,

vs.                                              CASE NO. 1:09-cv-251-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/


**REPORT AND RECOMMENDATION**

       Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") terminating her disability insurance benefits due to

medical improvement.  (Doc. 1.)  The Commissioner has answered (Doc. 10), and both

parties have filed briefs outlining their respective positions.  (Docs. 17 and 22.)  For the

reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

       On August 9, 2001, Plaintiff protectively filed an application for disability

insurance benefits, alleging a disability onset date of June 11, 2001.  (R. 78.)  Plaintiff's

application was denied initially and upon reconsideration, at which point Plaintiff timely

pursued her administrative remedies available before the Commissioner and requested

a hearing before an Administrative Law Judge ("ALJ") on May 2, 2002.  (R. 78.)  ALJ

Linda R. Haack ("ALJ Haack") concluded that an oral hearing was not necessary

because there was sufficient evidence in the record to establish a disability and, accordingly, ALJ Haack issued a decision favorable to Plaintiff on July 26, 2002 for a period of disability commencing on June 11, 2001.  (R. 78-81.)  ALJ Haack also recommended that a medical review of Plaintiff's condition be conducted within eighteen (18) months of her July 26, 2002 decision.  (R. 81.)

On October 13, 2006 Plaintiff was notified that her entitlement to disability insurance benefits would end on December 1, 2006 because the Commissioner had determined that she was no longer disabled.  (R. 32-33, 67-70.)  Plaintiff appealed this determination and was denied upon reconsideration on May 18, 2007.  (R. 45-63.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and on May 23, 2007 requested a hearing before an ALJ.  (R. 44.)  ALJ Arthur W. Stacy ("ALJ Stacy") conducted an administrative hearing on January 15, 2008 and issued a decision unfavorable to Plaintiff on February 26, 2008 in which he concluded that Plaintiff's disability had ended as of December 1, 2006.  (R. 13-22.) Plaintiff's request for review of ALJ Stacy's hearing decision by the Appeals Council was denied on October 8, 2009.  (R. 5-7.)  Plaintiff then appealed to this Court.  (Doc. 1.)

## II.  CONTINUING DISABILITY STANDARD OF REVIEW

This case does not involve the review of an initial application for disability benefits, but rather a review of Plaintiff's continuing disability in order to determine if she remains eligible to receive benefits. In determining whether a claimant's disability continues or ends, the Commissioner must determine whether there has been any

medical improvement in the claimant's impairment(s) and, if so, whether the medical improvement is related to the claimant's ability to work.[1]  In determining whether medical improvement has occurred the Commissioner will compare the medical severity of the Plaintiff's impairment(s) at the time of the decision to continue or discontinue benefits to the medical severity of the impairment(s) when benefits were awarded.[2]

Medical improvement is defined as any decrease in the medical severity of the claimant's impairment(s) that was present at the time of the most recent favorable medical decision that the claimant was disabled.[3]  This most recent favorable medical decision that the claimant was disabled is known as the comparison point decision ("CPD").[4]  A finding of a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with the claimant's impairment(s).[5]  Symptoms are the claimant's description of the impairment(s).[6]  Signs are abnormalities which can be observed and must be shown by medically acceptable clinical diagnostic techniques.[7]  Laboratory findings are findings produced by medically

---

[1] 20 C.F.R. § 404.1594(a). The definitions and evaluation process governing disability determinations for disability insurance benefits under Title II of the Social Security Act are identical to those governing benefits under supplemental security income, Title XVI of the Act. *See* 20 C.F.R. § 416.101, *et seq*.

[2] 20 C.F.R. § 404.1594(b)(7).

[3] 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(I).

[4] 20 C.F.R. § 404.1594(b)(7).

[5] *Id.*

[6] 20 C.F.R. §§ 416.928(a), 404.1528(a).

[7] 20 C.F.R. §§ 416.928(b), 404.1528(b).

acceptable laboratory techniques.[8]  Medical improvement is related to the claimant's ability to do work if there has been a decrease in the severity of the impairment(s) present at the time of the most recent favorable medical decision that the claimant was disabled and an increase in the claimant's functional capacity to do basic work activities.[9]  Section 404.1594(f) of the Code of Federal Regulations outlines the evaluation steps to be taken in reviewing whether a claimant's disability continues. These steps are:

> (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant's disability status will cease.
>
> (2) If no, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 [of the regulations]?
>
> (3) If no, has there been medical improvement in the claimant's condition?  If yes, proceed to Step 4.  If no, the claimant's disability continues.
>
> (4) Is the medical improvement in the claimant's condition related to his ability to work?  If no, proceed to Step 5.  If yes, proceed to Step 6.
>
> (5) If the medical improvement in the claimant's condition is not related to his ability to work, do any of the exceptions[10] listed apply?  If no, the claimant's disability continues.
>
> (6) If the medical improvement is found to be related to the claimant's ability to

---

[8] 20 C.F.R. §§ 416.928(c), 404.1528(c).

[9] 20 C.F.R. § 404.1594(b)(3).

[10] If a claimant meets any of the following exceptions, even if medical improvement has not occurred, the individual can still be found capable of substantial gainful activity if:
> (1) The claimant was the beneficiary of advances in medical or vocational therapy or technology (related to the claimant's ability to work).
> (2) The claimant has undergone vocational therapy related to his or her ability to work.
> (3) Based on new or improved diagnostic or evaluative techniques, claimant's impairment(s) is/are not as disabling as was thought at the time of the most recent favorable decision.
> (4) Substantial evidence demonstrates that any prior disability decision was in error.

work, the Commissioner will determine whether all of the claimant's current impairments, in combination, are severe.

(7) If these impairments are severe, the Commissioner will assess the claimant's residual functional capacity to determine whether the claimant can perform his past relevant work.  If the Commissioner determines that the claimant can perform his past relevant work, his disability status will cease.

(8) If the claimant can no longer perform his past relevant work, the Commissioner will assess whether the claimant can do other work considering the claimant's residual functional capacity, age, education and past work experience.  If he can, his disability status will cease.

In the case of a determination as to continuing disability, the court must review the Commissioner's final decision in terms of both the eight-step analysis outlined above and the general substantial evidence standard of review.  Therefore, the appropriate inquiry is "whether the [Commissioner]'s finding of improvement to the point of no disability is supported by substantial evidence."[11]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[12]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[13]  The district court must view the evidence as a whole,

---

[11] Simpson v. Schweiker, 691 F.2d 966, 969 (11th Cir. 1982); *see also* 42 U.S.C. § 405(g).

[12] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995)(citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401 (1971))); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[13] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[14]

However, the district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the district court with

sufficient reasoning to determine that the Commissioner properly applied the law.[15]

### III. SUMMARY OF THE RECORD

The Plaintiff's challenge to the Commissioner's decision focuses upon ALJ

Stacy's determination that Plaintiff's medical condition had improved as of October 1,

2006. Based upon that improvement, ALJ Stacy concluded that Plaintiff retained the

residual functional capacity ("RFC") to perform her past relevant work as a medical

clerk and, accordingly, that Plaintiff was no longer disabled. Therefore, the Court will

focus its discussion of the record on that issue.

### A. Personal Background

Plaintiff was born on January 5, 1960, which made her 48 years old as of the

date of her administrative hearing. (R. 584.) Plaintiff completed 14 years of schooling,

graduated from high school and then completed two years of college. (R. 584.)

Plaintiff last worked in February 2001 and was not working at the time of her

administrative hearing. (R. 584.)

### B. ALJ Haack's July 26, 2002 Decision

ALJ Haack concluded in the CPD in this case that Plaintiff had the following

---

[14] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)(holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[15] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

severe impairments: adenocarcinoma of the colon status post surgical resection with resulting residual conditions, a depressive disorder and multiple sclerosis ("MS").  (R. 79.)  ALJ Haack noted that Plaintiff underwent six months of chemotherapy after surgery was performed to remove the cancer in her colon, as well as interferon treatments for her MS. (R. 79.)  ALJ Haack took particular note of the reports from Plaintiff's treating oncologist at the time, Dr. Richard Gorman, M.D., that Plaintiff's chemotherapy and interferon treatments produced "significant" and "debilitating" fatigue that Dr. Gorman believed precluded Plaintiff from working effectively.  (R. 79.)  This led ALJ Haack to conclude that Plaintiff could not perform even sedentary work on a sustained basis as a result of her severe and persistent fatigue.  (R. 79.)  ALJ Haack also considered Plaintiff's subjective allegations concerning her ability to work and found them credible.  (R. 80.)  Accordingly, ALJ Haack concluded in the CPD that Plaintiff had been under a disability as of June 11, 2001, but ALJ Haack also cautioned that "claimant's condition may improve in the future" and recommended that an early continuing disability review be conducted within 18 months of the CPD.  (R. 80-81.)

### C.   Evidence Considered By ALJ Stacy

The majority of the medical evidence considered by ALJ Stacy consisted of Plaintiff's medical records from her visits to the Veterans Administration Medical Center in Gainesville, FL ("Gainesville VA").  Several consulting physicians and psychologists also completed disability evaluations, physical residual functional capacity assessments and mental status assessments of Plaintiff which ALJ Stacy also relied upon in making his determination that Plaintiff had achieved medical improvement in the severity of her impairments.  The Court will discuss each source in turn.

### 1. Medical Records from the Gainesville VA Clinic/Hospital

Plaintiff received the great majority of her medical treatment during the relevant period at the Gainesville VA during numerous visits between 2002 and 2008. Briefly, the treatment records disclose the following.

A tissue sample collected from Plaintiff's colon in May 2002 revealed no tumors. (R. 187-88.) Plaintiff's April 2003 colonoscopy reflected "no evidence of significant pathology in [Plaintiff's] entire colon, which led to a conclusion that Plaintiff had a normal colon. (R. 267.) On a visit on February 24, 2004, Plaintiff reported mild fatigue as well as numbness and tingling in her hands and feet, but Dr. Carrie Ann Labelle concluded that Plaintiff "is doing well, without evidence of recurrent disease." (R. 265.)

A follow-up visit in March 2004 to check on Plaintiff's previously diagnosed case of MS reflected that Plaintiff reported that she was doing well and she had experienced no new weakness or sensory changes. (R. 252.) A CT scan of Plaintiff's abdomen and pelvis performed that same month showed no evidence of recurrence in Plaintiff's colon cancer. (R. 263.) Plaintiff's yearly colonoscopy in April 2004 revealed a single three millimeter sessile polyp in her descending colon, which was resected and removed, as well as some nodules in Plaintiff's rectum and ascending colon, but the biopsies of the polyp and nodules were "essentially normal." (R. 253, 258.) A visit in June 2004 revealed that Plaintiff "is doing well, without evidence of recurrent disease." (R. 248.)

Plaintiff visited the ER on August 14, 2004 for complaints of unresolved chest pain on her right side, which she had been experiencing for a week, and Plaintiff was given a gastrointestinal cocktail, which she reported had provided her with "significant relief of [her] symptoms." (R. 245.) Plaintiff's labwork and EKG came back normal

and an X-ray of her chest showed her cardiac silhouette to be within normal limits, which led to the conclusion that Plaintiff was not suffering from any acute cardiopulmonary disease.  (R. 519.)

A CT scan of Plaintiff's abdomen and pelvis on September 27, 2004 produced unremarkable results.  (R. 517.)  On a visit on October 12, 2004, Plaintiff complained of "really bad" chest pain since August, but a stress test performed a month later showed normal results.  (R. 241, 244.)  A gastric emptying scan was performed on November 18, 2004 to check out the bloating and abdominal pain that Plaintiff had reported suffering from after eating, but the exam demonstrated normal gastric emptying half-time and no evidence of gastroparesis.  (R. 516.)

An MRI of Plaintiff's brain in February 2005 demonstrated results that were unchanged from Plaintiff's previous brain MRI on June 17, 2002.  (R. 162-63, 292.)  CT scans of her abdomen and pelvis in March 2005 were  "unremarkable."  (R. 160.)  A colonoscopy on April 6, 2005 showed no abnormalities in Plaintiff's colon.  (R. 222.) Plaintiff's visit to her oncologist at the Gainesville VA, Dr. Erin Dunbar, on May 5, 2005 reflected that Plaintiff continued to show no signs of colon cancer.  (R. 219, 511.)

Plaintiff visited the ER on July 29, 2005 complaining of dizziness, vertigo and a dull discomfort across the left side of her chest.  (207-10, 501.)  She was given Phenergan, which she reported successfully resolved her vertigo.  (R. 209.)  An EKG of Plaintiff's abdomen on July 30, 2005 revealed that, despite Plaintiff's complaints of chest pain, her heart was normal sized, with no evidence of pneumothorax and no large infiltrates or effusions, leading to a conclusion of no active disease by Dr. James Grantham.  (R. 159.)  On a follow-up visit on August 1, 2005, Plaintiff was prescribed

Valium, and it was noted that she had a heart murmur.  (R. 207, 497.)

CT scans of Plaintiff's pelvis and abdomen performed on a September 12, 2005 visit revealed no abnormal soft tissue masses or evidence of any local recurrence of her colon cancer, which led Dr. Richard Magrini to conclude that Plaintiff showed no evidence of recurrence of her colon cancer.  (R. 156-58, 461-63.)  A tissue sample taken from Plaintiff's stomach in September 2005 also showed organisms consistent with H. Pylori bacteria present in Plaintiff's stomach.  (R. 184.)  A colonoscopy taken at this time showed several non-thrombosed external hemorrhoids but was otherwise normal, while an endoscopy revealed nothing abnormal.  (R. 197-98.)  An EKG also revealed no abnormalities, no pericardial effusion, normal valves and normal LV and RV systolic function.  (R. 200.)

Plaintiff's visit to Dr. Dunbar on September 13, 2005 revealed no recurrence of her colon cancer, and Dr. Dunbar noted in the progress notes for that visit that Plaintiff had undergone a "stable exam without evidence of recurrence or mestastases" of cancer.  (R. 201-03.) The progress notes also reflected that Plaintiff was 4.5 years removed from the diagnosis of colon cancer and that every laboratory test, examination or CT since had lacked evidence of recurrence of her cancer.  (R. 201-03.)

Dr. Dunbar, who had assumed care of Plaintiff in July 2004, wrote a letter at Plaintiff's request in October 2005 regarding Plaintiff's disability status.  (R. 193.)  Dr. Dunbar noted that Plaintiff had been "durably without evidence of colon-cancer" since July 2004 and that "there are no active Oncologic issues that I am treating [and] [n]o plans for future Oncologic treatment."  (R. 193.)  An endoscopy performed later that same month revealed H. Pylori bacteria in Plaintiff's stomach and Plaintiff was

10

prescribed two anitibiotics and an acid suppression medicine in order to kill the bacteria. (R. 194-95.) The course of treatment was successful, as tests in early December were negative for the continued presence of the H. Pylori bacteria. (R. 189, 196.)

Plaintiff's annual medical examination in December 2005 revealed that her stool was negative for H. Pylori bacteria. (R. 189.) Plaintiff reported that although she did have problems with vertigo on and off, that the prescribed Phenergan she had been taking "works a lot better" than the Meclizine that she had previously taken. (R. 189-90.) She also reported a history of numbness on the left side of her body and was told that it could be early MS, but that the diagnosis was not definitive. (R. 190.) There was also a notation that reflected that Plaintiff did not suffer from depression or anxiety. (R. 190.) Despite Plaintiff's complaints of chest pain, the exam did not reveal any murmurs, rubs or gallops with regard to her heart and her lungs were clear to auscultation and there was no evidence of respiratory distress. (R. 192.)

Plaintiff visited the ER on February 7, 2006 complaining of marked pain in her left chest and shoulder and was diagnosed with chest wall pain, although an EKG produced normal results, and she was prescribed Salsalate and Tylenol with Codeine. (R. 305-06, 309, 430-31, 434.) Scans of Plaintiff's chest reflected that her heart, vasculature, mediastinum, lungs, and osseous structures were all normal, which led to a conclusion that the scans reflected a normal chest without etiology for the self-reported chest pain. (R. 460-61.) Follow-up scans of Plaintiff's chest on April 9, 2006 reflected no significant change in the appearance of Plaintiff's chest, no signs of active pulmonary disease and her heart, osseous structures, and soft tissue outlines were all normal. (R. 457-58.)

A CT scan of Plaintiff's abdomen and pelvis performed on March 1, 2006 reflected no evidence of recurrent or metastatic disease. (R. 458-60.) Plaintiff's visit on March 28, 2006 to Dr. Dunbar, her oncologist, revealed that Plaintiff continued to be free of colon cancer. (R. 298, 423.) Dr. Dunbar noted that Plaintiff was five years removed from her cancer diagnosis, and that there was no laboratory, exam or CT scan evidence of its recurrence since the initial diagnosis. (R. 299, 424.)

Plaintiff's scheduled colonoscopy on April 3, 2006 was cancelled, with Dr. Victor Machicao noting that Plaintiff's five colonoscopies in the previous three years were all negative for adenomas and that another colonoscopy was unnecessary. (R. 296, 421.) Plaintiff returned to the Gainesville VA on April 21, 2006 for a follow-up visit of what her medical records refer to as her "questionable" history of MS, and Plaintiff reported that she had no new weakness or sensory changes or episodes since she was last seen. (R. 292, 417.) Dr. Phillip Tallent concluded that Plaintiff "[h]as been doing well" and that some of her previous MS symptoms were likely a byproduct of her chemotherapy instead of MS. (R. 292, 417.) On an April 25, 2006 visit to her gastroenterologist, the progress notes reflected that Plaintiff's colon cancer had not recurred in 5 years. (R. 290-91.) On a June 19, 2006 visit Plaintiff reported that she had not suffered from vertigo lately and that Phenergan continued to work well. (R. 409.)

A CT scan of Plaintiff's abdomen and pelvis on September 26, 2006 showed no evidence of recurrent colon cancer and no signs of metastatic disease. (R. 396, 453-56.) An esophageal manometry taken that day reflected that Plaintiff was suffering from a hypertensive lower esophageal sphincter. (R. 485.) Plaintiff's visit to her oncologist on October 3, 2006 revealed that Plaintiff was '[d]oing great from [a] colon

cancer standpoint" and had been in complete remission for five years. (R. 397-98, 400.)

At Plaintiff's annual medical examination in December 2006 she reported chest pain while eating, which was attributed to esophageal spasms. The conclusion was that Plaintiff's only risk factors as far as her chest pain was concerned were mildly elevated cholesterol and positive family history of heart issues. (R. 485, 488.) It was also noted that Plaintiff had exhibited no recurrence of her colon cancer since 2001. (R. 488.)

Plaintiff visited her gastroenterologist on December 20, 2006 and the progress notes from that visit reflected that Plaintiff's H. Pylori problems had been resolved. Plaintiff was also suffering from trouble swallowing and her esophageal manometry showed increased lower esophageal sphincter pressure. (R. 483.) Plaintiff was admitted to the ER on December 22, 2006 complaining of chest pain, which was likely caused by esophageal spasms, but her cardiac work-up was negative. (R. 473, 476, 477.) It was determined that Plaintiff had not suffered a heart attack, and she was discharged on December 24, 2006 with a diagnosis of non-cardiac chest pain. (R. 476-78.) Plaintiff's follow-up visit to her gastroenterologist on April 18, 2007 reflected that her previous chest pain was of uncertain etiology. It was noted that she was partially responding to the prescribed isosorbide mononitrate and Diltiazem. (R. 473-74.)

Plaintiff's May 30, 2007 follow-up visit for her chest pain reflected that although Plaintiff still complained of chest pain, the pain had improved since she had started taking Diltiazem, and her cardiac workup was again negative. (R. 562-63.) Dr. Cynthia Preston, M.D. concluded that Plaintiff was suffering from atypical chest pain and elevated cholesterol. Dr. Preston also checked Plaintiff's Carcinoembryonic Antigen

13

("CEA") in order to ascertain whether Plaintiff's colon cancer had returned.  (R. 566.)

Dr. Preston determined that Plaintiff's CEA was non-elevated, meaning that her cancer

had not returned.  (R. 566.)   Plaintiff was also given a depression screening that asked

whether, over the past two weeks, she (I) had little interest or pleasure in doing things

or (ii) had felt down, depressed or hopeless. Plaintiff answered "Not at all" to both

questions.  (R. 567.)

Dr. Shea Ross, M.D. of Digestive Disease Associates in Gainesville, Florida, to

whom Plaintiff was referred by the VA for a pH study, performed an examination of

Plaintiff on July 23, 2007 and noted that Plaintiff complained of chest pain that she

described as a pressure sensation in the substernal area that was aggravated by food

and improved with drinking cold liquids.  (R. 569.)  Dr. Ross's physical examination

revealed  normal findings regarding Plaintiff's chest, lungs, cardiovascular system,

abdomen, and upper and lower extremities. A neurological exam was also normal.  (R.

569-72.)

An endoscopy performed on Plaintiff's upper gastrointestinal tract on October 19,

2007 at the Gainesville VA to check on suspected reflux esophagitis revealed that

Plaintiff's esophagus, stomach, and duodenum were all normal.  (R. 551-52.)  A

colonoscopy performed that same day revealed no significant findings, other than

external, non-bleeding hemorrhoids.  (R. 553.)

Plaintiff's next visit to her gastroenterologist took place on October 24, 2007,

during which she reported that she continued to suffer from intermittent chest pain with

eating.  To treat the condition Plaintiff's prescription for Diltiazem was replaced with

Procardia.  (R. 548-50.)  The diagnosis was a mildly hypertensive lower esophageal

sphincter. (R. 550.)

On an October 26, 2007 visit to follow-up on Plaintiff's complaints of left hand numbness, the progress notes reflected that Plaintiff's previous MS diagnosis was "questionable" and was not confirmed by oligoclonal bands or separate clinical events. (R. 546-47.)  Carpal tunnel syndrome in Plaintiff's left hand was ruled out.  (R. 547-48.) EMG and nerve conduction studies performed on both of Plaintiff's arms on October 30, 2007 revealed electrophysiological evidence that Plaintiff was suffering from right-sided carpal tunnel syndrome of undetermined clinical significance.  (R. 540, 564, 576-77.)  An MRI of Plaintiff's head performed on November 13, 2007 revealed only a single new white lesion on Plaintiff's brain when compared with Plaintiff's previous brain MRI from February 14, 2005.  (R. 529.)

### 2.    Physical RFC Assessments and Mental Status Examinations

Plaintiff underwent several physical RFC assessments and mental status examinations that ALJ Stacy also relied upon in concluding that Plaintiff had experienced medical improvement.

Plaintiff underwent a disability evaluation by Dr. Oscar Depaz, M.D., a consulting physician, on August 7, 2006.  (R. 324-26.)  Plaintiff complained of more frequent pain in her fingers and toes, chest pain due to her food going down slowly, and problems with bowel movements shortly after eating.  (R. 324.)  Dr. Depaz concluded that "[t]here is no evidence of cancer recurrence," that Plaintiff had a history of H Pylori bacteria for which she had received therapy, and that she had possible dumping syndrome.  (R. 325-26.)  Plaintiff also complained of dizziness with head motion, but Plaintiff's Romberg and neurologic exams were within normal limits.  (R. 326.)  Dr. Depaz did

note, however, that Plaintiff had decreased sensation in the ulnar aspect in her right hand and decreased sensation in the lateral toes of her right foot, but that her sensation was otherwise within normal limits.  (R. 325.)

Dr. Donald Morford, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on August 29, 2006 and concluded that "[s]ignificant medical improvement has occurred."  (R. 344-52.)  Dr. Morford concluded that Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday.  (R. 345.)  He noted that Plaintiff's medical records showed that she is much more active than before and that her CEA had declined.  (R. 346.)  Dr. Morford also noted that Plaintiff's complaints of dizziness were not established by testing or observations, that her colon cancer has not recurred and that her chemotherapy "has long been ceased."  (R. 349.)

Another Physical Residual Functional Capacity Assessment, completed by Dr. Nicolas Bancks, M.D. and dated January 5, 2007, also concluded that there had "clearly" been medical improvement in Plaintiff's condition.  (R. 353-60.)  Dr. Bancks concluded that Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday.  (R. 354.)  Dr. Bancks noted that Plaintiff's MS diagnosis was questionable based upon Plaintiff's normal neurological and Romberg exams and the lack of any recent interventions.  He also noted that Plaintiff was able to carry out fairly good activities of daily living, which had previously been "awful" at the time of the CPD due to the side effects from Plaintiff's

16

chemotherapy, as well as that her oncologists had remarked that Plaintiff was doing great from a colon cancer perspective.  (R. 354-55, 358.)

Linda Abeles, Ph.D., a consulting psychologist, concluded in her mental status examination of Plaintiff on March 7, 2007 that Plaintiff appeared to be suffering from some Personality Disorder Traits as well as a Depressive Disorder, but that Plaintiff's "level of psychological functioning would not preclude her from obtaining or maintaining employment."  (R. 363.)  Michael Zelenka, Ph.D., another consulting psychologist, completed a Psychiatric Review Technique Form dated March 14, 2007, which reflected his conclusion that, although Plaintiff reported being depressed, Plaintiff's depression was not a severe impairment and that Plaintiff's activities of daily living were only mildly limited by depression.  (R. 364, 367, 374, 376.)  He also noted that Plaintiff's medical records from the VA included no mental diagnosis on Plaintiff's current Problem List.  (R. 376.)

**D.    Hearing Testimony**

At the administrative hearing Plaintiff testified that she had undergone a course of chemotherapy for approximately eight months, concluding in February 2002, in order to deal with the colon cancer that was discovered in 2001.  (R. 589.)  Plaintiff testified that she has been depressed and worried about what was happening to her body since her chemotherapy had ended in February 2002.  (R. 589.)  Plaintiff also testified that, because of her depression, she does not do the things that she used to do and that she stays in the house all day virtually every day.  (R. 591.)   She also reported suffering bowel movements shortly after eating, sometimes with no warning whatsoever, approximately 3-4 times a month.  (R. 589-90.)

17

Plaintiff further testified that she frequently experiences vertigo, but reported that the Promethazine that she had been prescribed worked better than the Meclizine that she was initially prescribed.  (R. 592-93.)  Plaintiff also testified that she feels tired most of the time and that this fatigue affects her every single day.  (R. 593.)  Plaintiff further testified that her medical issues caused her not to be able to remember if she had already performed or started performing a particular task, causing her to repeatedly have to restart tasks.  (R. 594.)  Upon examination by ALJ Stacy, Plaintiff stated that she could only lift less than ten pounds comfortably, that she could sit comfortably for only an hour or two at the most, and that she can only stand for thirty minutes to an hour.  (R. 594-95.)  She also testified that she could walk approximately half a block before getting tired and having to stop.  (R. 595.)

### E.    Findings of ALJ Stacy

ALJ Stacy found that Plaintiff had not engaged in substantial gainful activity since the CPD dated July 26, 2002.  (R. 17-18.)  ALJ Stacy noted that ALJ Haack had concluded that Plaintiff, at the time of the CPD, had the medically determinable impairments of significant anemia, malignant neoplasm of her colon, and multiple sclerosis.  (R. 18.)  ALJ Stacy noted that ALJ Haack had determined that Plaintiff's impairments resulted in the determination that Plaintiff had the RFC to perform less than the full range of sedentary work due to the extreme weakness and fatigue that Plaintiff suffered from her chemotherapy and interferon treatments.  (R. 18.)

ALJ Stacy concluded that the medical evidence established that Plaintiff did not develop any additional impairments after the CPD through October 1, 2006, and that Plaintiff continued to have the same impairments that she had at the time of the CPD.

18

(R. 18.)  He concluded that since October 1, 2006 Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings because the medical evidence did not support listing-level severity and no acceptable medical source mentioned findings equivalent in severity to any listed impairment.  (R. 18.)  Instead, he concluded that medical improvement had occurred as of October 1, 2006 and that the medical evidence supported a finding that, as of October 1, 2006, there had been a decrease in the medical severity of Plaintiff's impairments.  (R. 19.)

After considering the entire record, ALJ Stacy came to the conclusion that Plaintiff had the RFC to perform the full range of light and sedentary work and that Plaintiff's medical improvement was related to her ability to work because it resulted in an increase in her RFC.  (R. 21.)  Crucial to this finding was his determination that Plaintiff's medically determinable impairments could not have been reasonably expected to produce Plaintiff's alleged severe and disabling symptoms and that Plaintiff's statements and testimony at the administrative hearing concerning the continuity, intensity, persistence, and limiting effects of her symptoms were not entirely credible.  (R. 21.)  ALJ Stacy concluded that Plaintiff's chronic and severe complaints of pain, discomfort, functional limitation and depressive symptoms were inconsistent with the overall medical evidence because she had been receiving appropriate conservative medical treatment for her alleged physical impairments and her mental condition was not considered severe, as Social Security regulations require.  (R. 21.)

ALJ Stacy concluded that, although Plaintiff's impairments were severe and caused more than minimal limitation in her ability to perform basic work activities, that her physical impairments have not significantly interfered with her activities of daily

living and therefore she is capable of performing work activities on a sustained basis with minimal interruptions. (R. 22.) Accordingly, ALJ Stacy concluded that, as of October 1, 2006, Plaintiff had been capable of performing her past relevant work as a medical clerk, which did not require the performance of work-related activities that would be precluded by Plaintiff's RFC, meaning that Plaintiff's disability ceased as of October 1, 2006 and terminated as of December 1, 2006. (R. 22.)

## IV. DISCUSSION

Plaintiff argues that ALJ Stacy erred in concluding that she had experienced medical improvement in the severity of her impairments. Plaintiff contends that the ALJ erred in not finding Plaintiff fully credible and in addressing steps 4 and 5 of the required medical improvement analysis. Despite Plaintiff's contention otherwise, ALJ Stacy performed the correct analysis and substantial evidence supports ALJ Stacy's determination that Plaintiff's disability ended as of December 1, 2006.

### A. Plaintiff's Credibility

Plaintiff contends that ALJ Haack's determination that Plaintiff was fully credible is *res judicata* to ALJ Stacy's subsequent determination that Plaintiff was not credible. Plaintiff's argument misconstrues the concept of *res judicata* as it applies in the administrative context.

Administrative *res judicata* applies in a Social Security case when the Commissioner "has made a previous final decision 'about a claimant's rights on the same facts and on the same issue or issues.'"[16] In this case, ALJ Haack had to decide

---

[16] Moreno v. Astrue, 366 Fed. Appx. 23, 27 (11th Cir. 2010)(quoting 20 C.F.R. § 404.957(c)(1)).

whether Plaintiff was disabled as of June 11, 2001, while ALJ Stacy was tasked with determining a completely different issue as to whether Plaintiff's disability had ended as of December 1, 2006. ALJ Stacy was also making his determination based upon a wealth of facts – nearly six years' worth of new medical evidence – not available to ALJ Haack. ALJ Stacy therefore considered a separate issue based on different facts from the issue decided by ALJ Haack. Accordingly, ALJ Stacy is not bound by the determination of a prior ALJ as to the Plaintiff's credibility.[17] ALJ Stacy thus did not err in determining that Plaintiff's statements and testimony concerning her symptoms were not credible.

### B. Evidence of Medical Improvement in the Severity of Plaintiff's Impairments

Plaintiff also contends that ALJ Stacy failed to properly follow steps 4 and 5 of the required analysis utilized with respect to medical improvements, because there is no evidence of any medical improvement in the severity of her impairments. As previously noted, step 4 requires the ALJ to determine if, in the event that a claimant has experienced medical improvement, whether that improvement is related to the claimant's ability to work.[18] Step 5 requires the ALJ to determine, if the medical improvement is not related to the claimant's ability to work, whether any of the listed exceptions apply.[19] After a comprehensive review of the record ALJ Stacy specifically

---

[17] See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001)(an ALJ is not bound by a previous ALJ's findings as to a claimant's subjective complaints of pain, RFC and credibility in the continuing-review context).

[18] 20 C.F.R. § 404.1594(f).

[19] Id.

considered whether Plaintiff had experienced medical improvement in her impairments and then went on to conclude that the medical improvement related to Plaintiff's ability to work because it resulted in an increase in her RFC.  (R. 18-21.)  This is completely consistent with the analysis required by the applicable regulation, Section 404.1594(f).  Moreover, in addition to performing the required analysis, ALJ Stacy's determination that Plaintiff experienced medical improvement was supported by substantial medical evidence in the record.

This is particularly true with respect to Plaintiff's colon cancer.  ALJ Stacy noted that the medical record failed "to show evidence of recurrent colon cancer according to further diagnostic tests."  (R. 18, 19.)  The progress notes from Plaintiff's May 5, 2005, September 13, 2005, March 28, 2006, and October 3, 2006 visits to her oncologist reflected that Plaintiff's colon cancer never recurred and that Plaintiff no longer suffered any effects from either the chemotherapy or the cancer itself.  (R. 201-03, 219, 298, 400, 423, 511.)  CT scans of Plaintiff's abdomen and pelvis in September 2004, March 2005, September 2005, March 2006, and September 2006 –  as well as five colonoscopies performed between April 2003 and October 2007 –  also confirmed no further issues with regard to colon cancer.  (R. 159-58, 160, 197-98, 253, 258, 267, 296, 458-60, 461-63, 485, 517, 550.)

The record also supports ALJ Stacy's determination that Plaintiff experienced medical improvement in both her multiple sclerosis and depressive disorder.  Plaintiff self-reported during a visit on May 3, 2004 with regard to her MS that she was doing well and had experienced no weakness or sensory changes.  (R. 252.)  Dr. Phillip Tallent concluded on April 29, 2006 that the previously reported symptoms that had led

to an MS diagnosis were likely a byproduct of Plaintiff's chemotherapy, not manifestations of MS. (R. 292, 417.) A February 2005 MRI of Plaintiff's brain revealed no new white lesions that would be consistent with MS when compared with Plaintiff's previous scan from three years before, while another MRI on November 13, 2007 revealed only a single new lesion. (R. 162-63, 292, 529.) A neurology consultation on October 26, 2007 to check on Plaintiff's "questionable" diagnosis of MS reflected that this diagnosis was "not confirmed by oligoclonal bands or separate clinical events." (R. 546-47.)

With respect to Plaintiff's depression, there is a wealth of medical evidence in the record that shows that Plaintiff's depressive disorder is not as disabling as she claimed. ALJ Stacy noted that, even though Plaintiff had been diagnosed with a depressive disorder, NOS, and personality disorder traits, that the mental status examination performed by consulting psychologist Linda Abeles, Ph.D. on March 7, 2007 reflected that Plaintiff showed no evidence of a psychotic or thought disorder and that Plaintiff's level of psychological functioning would not preclude her from obtaining or maintaining employment. (R. 18.) ALJ Stacy also took note of consulting psychologist Michael Zelenka, Ph.D.'s conclusion that Plaintiff had a non-severe affective disorder impairment, which ALJ Stacy concluded was consistent with the overall medical evidence of record. (R. 18-19.) Dr. Zelenka also noted that there was no mental health diagnosis on Plaintiff's current Problem List at the VA. (R. 376.) Plaintiff was also given a depression screening on May 30, 2007, which was negative. (R. 567.)

Medical improvement in the severity of Plaintiff's impairments were also supported by Plaintiff's self-reported activities of daily living, which ALJ Stacy cited In

support of his conclusion that there had been a decrease in the medical severity of Plaintiff's impairments.  (R. 19.)  ALJ Stacy noted that Plaintiff self-reported that she was able to perform light household chores, take care of her 7 year old and get him ready for school in the mornings, drive and run small errands, walk in the neighborhood, perform light household chores, and go to church with a neighbor.  (R. 19.)  These activities evidence a marked improvement over the "extreme" fatigue that Plaintiff reported to ALJ Haack and which her oncologist had called "significant" and "debilitating."  (R. 79.)

The examinations and physical RFC assessments performed by the consulting physicians also confirm ALJ Stacy's conclusion that Plaintiff had experienced medical improvement.   ALJ Stacy took note of the opinions of state agency physicians Dr. Donald Morford, M.D. and Dr. Nicolas Bancks, M.D., each of whom concluded that Plaintiff could perform light work activities, including lifting/carrying 10 pounds frequently and 20 pounds occasionally and standing/walking and sitting for 6 hours in an 8 hour workday.  (R. 21.)  ALJ Stacy accorded full weight to each doctor's statements, as ALJ Stacy found their statements to be consistent both with each other and with the medical evidence of record since mid-2006.  (R. 21.)  ALJ Stacy also noted that Plaintiff's August 7, 2006 examination by consulting physician Dr. Oscar Depaz, M.D. reflected that Plaintiff was normal from an orthopedic/neurological standpoint and that  Dr. Depaz's impression was status-post bowel resection for Dukes B colon cancer without recurrence on post-operative testing.  (R. 20.)  Although the opinions of non-examining state agency physicians are generally not entitled to the same weight as that of a

treating physician,[20]  they are nevertheless further evidence in support of the propriety of ALJ Stacy's conclusion that Plaintiff experienced medical improvement.

In sum, ALJ Stacy performed the required analysis in determining that Plaintiff had experienced a medical improvement in the severity of her impairments and this conclusion was supported by substantial evidence.  Plaintiff's colon cancer did not recur according to her oncologist and every CT scan and colonoscopy that was performed at the Gainesville VA. Plaintiff's previous diagnosis of MS was not supported by any clinical signs, and according to Plaintiff, her depression was not much of a hindrance in carrying on her daily routine.  ALJ Stacy's conclusion that Plaintiff achieved medical improvement in the severity of her impairments was supported by substantial evidence in the record in the form of her medical records from the Gainesville VA as well as her activities of daily living and the mental status examinations and physical RFC assessments performed by non-examining medical sources.  Accordingly, the decision of the Commissioner is due to be **AFFIRMED**.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on February 10, 2011.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

---

[20] *See* Hutchinson v. Astrue, Case No. 10-12197, 2011 WL 148062, at *2 (11th Cir. Jan. 18, 2011)("The opinions of treating physicians . . . are generally entitled to more weight than non-treating physicians unless 'good cause' is shown.").

## NOTICE TO THE PARTIES

Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.